**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> WAYNE LAWRENCE LOVELADY and ISRAEL OCHOA, <br><br> Defendants. | **MEMORANDUM DECISION AND ORDER DENYING DEFENDANTS' MOTIONS TO SUPPRESS** <br><br> Case No. 2:13-cr-00044-RJS <br><br> Judge Robert J. Shelby |

Defendants Wayne Lawrence Lovelady and Israel Ochoa have moved the court to suppress evidence obtained pursuant to a canine drug sniff and subsequent search of Lovelady's truck that occurred during a traffic stop. (Dkts. 43 and 48). The court has carefully considered the parties' briefing, testimony offered at an evidentiary hearing, video showing portions of the traffic stop,[1] audio recordings between police and dispatch pertaining to the stop,[2] and the argument of counsel. The court concludes that the police neither improperly expanded the scope of the investigation during the traffic stop nor unreasonably extended the duration of the stop to enable a trained police dog to conduct a drug sniff of the truck. Accordingly, the evidence derived from the search of the truck need not be suppressed. Defendants' Motions are DENIED.

---

[1] Defendant Ochoa's Exhibit 1003.

[2] Defendant Ochoa's Exhibit 1002.

## FACTUAL BACKGROUND

Shortly after midnight on November 16, 2012, Summit County, Utah Sheriff's Officer Vincent Nguyen was on duty and traveling westbound on Interstate 80, just west of Park City, Utah. (Tr. 9, 65.) He decided to flip a U-turn to switch directions and travel east, so he drove across the median between the westbound and eastbound highways. *Id.* Guiding his car into the far left of three eastbound lanes on Interstate-80, Officer Nguyen saw a Toyota Tundra truck with California license plates traveling within the speed limit ahead of him in the center lane. After Officer Nguyen entered the eastbound Interstate, the truck moved over to the far right lane. (Tr. 8-10.) Traffic flowed by an exit leading from the highway into Park City, but the truck's driver did not take that exit. (Tr. 66-67.)

The truck's movement into the far right lane positioned it closely behind the car in front of it—leaving only about a half-car's length between the vehicles. (Tr. 66-67.) Officer Nguyen observed this "tailgating" for several seconds and was concerned. (Tr. 10.) He understood Utah law prohibited tailgating, and testified that an appropriate "rule of thumb" is that motorists generally should leave one car length between vehicles for every ten miles per hour at which they are traveling. He was unaware of the law in terms of seconds which must be allowed to

elapse for travel between cars.[3]  (Tr. 8.)   Officer Nguyen followed the truck and contacted

dispatch to check its registration and insurance.  (Tr. 38, 67-68.)  Dispatch informed him that it

could find no insurance associated with the truck.  (Tr. 68.)  Officer Nguyen knew that Utah law

required automobiles traveling on the roads to be insured.[4]  (Tr. 9.)

     Officer Nguyen decided to pull the truck over for following too closely and the lack of

insurance information on file.  (Tr. 7, 38.)  He was also suspicious because the truck's driver had

moved into the far right lane approaching an exit, but did not take the exit.  (Tr. 10.)

     Officer Nguyen pulled the truck over at about 12:17 a.m.  (Tr. 38.)  The truck pulled off

the Interstate and stopped near mile marker 145 outside of Park City.  (Tr. 9.)  Officer Nguyen

left his car and approached the truck's passenger side to avoid traffic.  Two males were inside:

---

[3] Utah Code Annotated § 41-6a-711, *Following another vehicle -- Safe distance – Exceptions*,
provides:

> (1) The operator of a vehicle:
>
> (a) may not follow another vehicle more closely than is reasonable and prudent,
> having regard for the:
>
> (i) speed of the vehicles;
>
> (ii) traffic upon the highway; and
>
> (iii) condition of the highway; and
>
> (b) shall follow at a distance so that at least two seconds elapse before reaching
> the location of the vehicle directly in front of the operator's vehicle….

[4] Utah Code Annotated § 41-12a-302(1)(a), *Operating motor vehicle without owner's or
operator's security—Penalty*, provides:

> (1) (a) Except as provided in Subsection (1)(b), an owner of a motor vehicle on
> which owner's or operator's security is required under Section 41-12a-301, who
> operates the owner's vehicle or permits it to be operated on a highway in this state
> without owner's security being in effect is guilty of a class B misdemeanor….

Ochoa and Lovelady. (Tr. 12.) Officer Nguyen asked Ochoa, the driver, for his license, registration, and proof of insurance. (Tr. 68.) Ochoa handed Officer Nguyen his California-issued driver's license. During this exchange, Ochoa stared straight ahead and seemed to Officer Nguyen to be avoiding eye contact. (Tr. 13, 38, 68.)

In the passenger seat nearest to Officer Nguyen, Lovelady was more communicative. He answered Officer Nguyen's questions and made eye contact as he did. (Tr. 68-69.) Officer Nguyen explained the reasons for the stop, asked where they were going, and requested the truck's registration and insurance. Lovelady responded that they were driving to his property in Craig, Colorado to shoot guns, that the truck was his, and that it was insured. Lovelady offered the truck's registration after finding it in the glove box. (Tr. 13-14, 21, 38, 40.) He was not able to find proof of insurance. Officer Nguyen did not ask Ochoa any follow up questions concerning insurance. For example, he did not inquire if Ochoa had any insurance of his own that might cover the truck while Ochoa was driving. (Tr. 50, 69.)

As Officer Nguyen began to return to his own vehicle to check Ochoa's license, Lovelady offered to provide his own identification to Officer Nguyen "if [he] needed it." (Tr. 14.) Officer Nguyen told Lovelady it would be helpful, although Officer Nguyen generally does not demand identification from a non-driver occupant of a vehicle during a traffic stop. (Tr. 14, 33.)

As Lovelady retrieved his wallet, Officer Nguyen saw that he was shaking. At times, Lovelady also folded his arms across his chest. Lovelady explained to Officer Nguyen that he was sick and cold, and that was why he had allowed Ochoa to drive his truck. (Tr. 40, 52.)

When Lovelady opened his wallet to get his identification, Officer Nguyen saw that he had two different photo identification cards in his wallet. (Tr. 14-15, 42.) This raised in Officer Nguyen a concern of possible "identity theft, if Mr. Lovelady was even who he [said] he was." (Tr. 15.) Lovelady explained that the extra identification card belonged to his brother, who was in jail. *Id.* Upon inspection, Officer Nguyen saw that they were both California identification cards. While the photographs on the cards seemed similar, "one was a heavier-set person, and the other person was a lot smaller in stature." *Id.* The identification cards had two different names on them— Wayne Lovelady and Steven Lovelady. *Id.* Although he knew it was not a crime to have someone else's identification, and Lovelady had not said anything which specifically caused him to think that Lovelady was engaged in unlawful activity with the extra identification, Officer Nguyen testified he was concerned and curious. (Tr. 43, 52, 72.) He took both identification cards along with Ochoa's driver's license.

Officer Nguyen walked toward his vehicle to request that dispatch perform a records check, which might reveal driving restrictions and any outstanding arrest warrants. (Tr. 16.) At that time, Officer Nguyen had not determined whether to issue a citation or give a verbal warning. (Tr. 41.) But before he could begin those checks, Park City Officer Brian Luangawasti arrived on the scene to offer help. (Tr. 16.) Officer Nguyen asked him to keep an eye on Lovelady and Ochoa. Officer Nguyen testified he was concerned because Ochoa and Lovelady seemed nervous, and because Lovelady had two identification cards in his wallet. (Tr. 16.)

After speaking to Officer Luangawasti, Officer Nguyen returned to his car. (Tr. 44.) Before he began the records check, Officer Nguyen called to request an officer with a drug-

sniffing dog to come to the scene. That night, U.S. Forest Service Officer Darren Schiedel was on patrol in the vicinity with his drug-sniffing dog, Livo. Officer Schiedel was about seven miles away from the traffic stop when he received the request for an officer with a drug-sniffing dog. (Tr. 93.) Officer Nguyen testified that Officer Schiedel arrived on the scene of the traffic stop about ten minutes after Officer Nguyen requested him. (Tr. 56.)

Within a few minutes of his request for a drug-sniffing dog, Officer Nguyen called dispatch to check on Ochoa's license and Lovelady's identification card—but he initially did not check the identification card for Lovelady's incarcerated brother.[5] (Tr. 17.) Officer Nguyen later explained that he "ran Mr. Wayne Lovelady first [because] he provided me registration with his name on it, and he identified the vehicle as his, so I wanted to move forward into that and try to identify who the registered owner is and who Mr. Wayne Lovelady is." (Tr. 17.)

After calling in Ochoa's license and Lovelady's identification card, Officer Nguyen awaited the responsive information—the 'returns.' *Id.* The audio recording of Officer Nguyen's calls to dispatch reveals Officer Nguyen waited a little over three minutes for those returns. (Def.'s Exh. 1002.) Often, Officer Nguyen would use the time waiting for a return or shortly

---

[5] Officer Nguyen is uncertain if he called in these records checks before calling for a drug-sniffing dog. (Tr. 44.) Upon reviewing the audio recording from dispatch, the court finds that he called for a drug-sniffing dog before he called in those records checks. Although this recording does not include a call from Officer Nguyen requesting an officer with a dog (the call may have been made on a cell phone or a different radio channel), Officer Nguyen is heard calling in the records checks on Ochoa's license and Lovelady's identification at the 6:59 minute mark. (Def.'s Exh. 1002.) Just over three minutes later, at the 10:18 minute mark, dispatch begins to provide the returns. *Id.* Officer Schiedel confirms his arrival just seconds later, at the 11:00 minute mark. *Id.* Officer Schiedel was about seven miles away when called to come to the scene, and must therefore have been called before the 6:59 minute mark.

after receiving it to write out a traffic citation so that if dispatch clears the driver's license, the driver can be cited and sent on his or her way. (Tr. 33-34, 56.) On this stop, however, Officer Nguyen did not begin to write out a ticket as he waited for the returns. The returns revealed that Ochoa's license was valid and unrestricted, while Lovelady's was suspended. (Tr. 19.)

Officer Schiedel and his dog, Livo, arrived on the scene less than a minute after Officer Nguyen received those returns. (Def.'s Exh. 1002.) Officer Schiedel radioed dispatch to confirm his arrival, left his car, and briefly consulted with Officer Nguyen about the situation. (Tr. 80.) Officer Schiedel then began recording video of the scene.[6] As the video starts, Ochoa is seen outside standing at the rear of the truck. Officer Nguyen is outside and visible on camera, speaking to Ochoa as Lovelady exits the truck under Officer Luangawasti's supervision. (Def.'s Exh. 1003.) After Lovelady exited the truck, Officer Nguyen conducted a pat-down search of Lovelady, and discovered a wad of cash. *Id.* Officer Nguyen questioned Lovelady about the money, and Lovelady told him it was for a real estate deal. *Id.* Officer Nguyen then informed Ochoa and Lovelady that the dog would be sniffing the truck. (Tr. 22, 46; Def.'s Exh. 1003.)

Officer Schiedel retrieved Livo from his car, walked him to the front of Lovelady's truck, and instructed him to lie down. (Def.'s Exh. 1003.) With the situation under control and while Officer Schiedel was occupied with Livo, Officer Nguyen contacted dispatch to perform a

_____

[6] Officer Schiedel video recorded the stop scene with camera-equipped eyeglasses. (Tr. 49, 81, 94; Def.'s Exh. 1003.) The video starts at the 11:50 minute mark of the dispatch audio recording. (Def.'s Exh. 1002.) At the video's 17:30 minute mark, Officer Schiedel approaches Lovelady with drug evidence from the truck, and Lovelady exclaims, "Oh my God!" Officer Schiedel responds, "Oh my God, where did that come from?" (Def.'s Exh. 1003.) The same exchange is heard starting at the 29:20 minute mark on the dispatch audio recording. (Def.'s Exh. 1002.)

records check on Steven Lovelady's identification card. This took place within four minutes after Officer Schiedel arrived on the scene.[7]

Next, Officer Schiedel inspected the truck's cab, shining a flashlight through the window. Then he helped facilitate Livo's sniff of the truck. (Def.'s Exh. 1003; Tr. 82-83.) As Livo walked around the truck, he 'alerted' multiple times, including on the back of the truck. (Def.'s Exh. 1003.)

Officer Schiedel told Lovelady and Ochoa of Livo's alerts and asked if there was any reason why the dog would alert to drugs. (Tr. 87.) Lovelady told him that he had a small amount of marijuana in the truck the day before. *Id.* Seconds later, as Officer Nguyen stood outside with Lovelady and Ochoa, dispatch radioed him with the return on Steven Lovelady's identification card, indicating that his license was suspended. (Def.'s Exh. 1002 and 1003.) This occurred less than six minutes after Officer Schiedel arrived on the scene, and about ten minutes after Officer Nguyen had first called in the records check on Ochoa's license and Lovelady's identification card.

The subsequent search of the truck's covered, locked bed yielded a large amount of marijuana and several guns. A small amount of methamphetamine was also found in Lovelady's pocket. As a result, Defendants were charged with Possession of Marijuana with Intent to

_____

[7] Officer Schiedel testified that he radioed dispatch to confirm his arrival on the scene. (Tr. 94; Def.'s Exh. 1002.) The confirming call can be heard at the 11:00 minute mark on the dispatch audio recording. (Def.'s Exh. 1002.) It is not until the 14:57 minute mark on the dispatch audio recording—about four minutes later—when Officer Nguyen called in a records check on the third license he held. *Id.* This corresponds to the 3:07 minute mark on the video—when the video shows Officer Schiedel walking Livo to the front of Lovelady's truck to have him lie down before he began the sniff of the truck. (Def.'s Exh. 1003.)

Distribute, in violation of 21 U.S.C. § 841(a)(1), and Possession of a Firearm in Furtherance of a Drug Trafficking Crime in violation of 18 U.S.C. § 924(c)(1)(A). Lovelady was also charged with Possession of Methamphetamine in violation of 21 U.S.C § 844(a). (Dkt. 1, Indictment dated Jan. 23, 2013.)

Mr. Lovelady now argues that the initial stop violated the Fourth Amendment because Officer Nguyen lacked a reasonable articulable suspicion of criminal activity before he stopped the truck. (Dkt. 48.) Both Defendants argue that once stopped, the scope of their detention was unreasonably expanded and the stop prolonged to facilitate Livo's drug sniff of the truck in violation of the Fourth Amendment. They move to suppress the evidence and statements obtained as a result of their prolonged detention, the dog's sniff, and the truck's eventual search.[8] (Dkts. 43 and 48.) Defendants' Motions raise the following issues: 1) whether the initial stop was lawful; and 2) if so, whether its scope was unreasonably expanded or its duration unreasonably prolonged.

## DISCUSSION

### I. Applicable Legal Standards

The Fourth Amendment guards against unreasonable searches and seizures by the government. U.S. Const. amend. IV. A traffic stop amounts to a "seizure" within the meaning of

---

[8] In his Motion to Suppress, Lovelady seeks to suppress statements elicited from him absent *Miranda* warnings and evidence obtained pursuant to a search warrant relating to five cell phones collected in this case. (Dkt. 48 at 2.) But Lovelady's briefing does not set forth a clear basis for excluding his statements pursuant to *Miranda* or evidence obtained pursuant to the warrant. Lovelady simply states that "statements were elicited from him while he was in custody and should therefore be excluded if obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), or if they were the fruit of an illegal detention." (Dkt. 75 at 25.)

the Fourth Amendment and is constitutionally valid only if it is reasonable. *United States v. Trestyn,* 646 F.3d 732, 741-42 (10th Cir. 2011). But because a routine traffic stop is often a relatively brief encounter, it "is more analogous an investigative detention than a custodial arrest," and is analyzed under the principles applicable to investigative detentions set forth in *Terry v. Ohio,* 392 U.S. 1, 22 (1968). *Id.* (citations omitted).

When determining the reasonableness of an investigative detention, a dual inquiry is required: 1) "whether the officer's action was justified at its inception," and 2) "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* (quoting *Terry*, 392 U.S. at 20). A stop is justified at its inception if an officer has (1) probable cause to believe a traffic violation has occurred, or (2) a reasonable articulable suspicion that a motorist has violated a traffic or equipment regulation. *United States v. Winder,* 557 F.3d 1129, 1134 (10th Cir. 2009).

Once the purpose for the stop is met "and any underlying reasonable suspicion dispelled," however, "the driver's detention generally must end without undue delay." *Id.* (citations omitted). In a routine traffic stop, an officer "may request a driver's license, vehicle registration and other required papers, run necessary computer checks, and then issue any warning or citation." *Id.* (quoting *United States v. Gregoire,* 425 F.3d 872, 879 (10th Cir. 2005)). An officer "may not extend a traffic stop beyond a reasonable duration necessary to accomplish the purpose of the stop unless the driver consents to further questioning or the officer has reasonable suspicion to believe other criminal activity is afoot." *United State v. Rice,* 483 F.3d 1079, 1083-84 (10th Cir. 2007). An officer's suspicion is reasonable when it arises from "a particularized

and objective basis for thinking the detained individual is involved in criminal activity." *United States v. Cortez-Galaviz,* 495 F.3d 1203, 1205-06 (10th Cir. 2007) (quotations omitted). Although an officer must have "some level of objective justification," *INS v. Delgado,* 466 U.S. 210, 217 (1984), she "need not rule out the possibility of innocent conduct as long as the totality of circumstances suffices to form a particularized and objective basis for a traffic stop." *Cortez-Galaviz,* 495 F.3d at 1206 (citations omitted). Reasonable suspicion may be supported by "a showing considerably less than preponderance of the evidence." *Id.* (citations omitted).

If suspicion arises, the investigative methods an officer uses "should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *United States v. Bejarano-Ramirez,* 35 Fed.Appx. 740, 744 (10th Cir. 2002) (quoting *Florida v. Royer,* 460 U.S. 491, 500 (1983)). It is the government's burden to demonstrate that a seizure it seeks to justify on the basis of reasonable suspicion "was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *Id.* (quoting *Royer*, 460 U.S. at 500). In evaluating whether the government has met this burden, the court views "the officer's conduct in light of common sense and ordinary human experience," and defers to "an officer's ability to distinguish between innocent and suspicious actions." *United States v. Kitchell*, 653 F.3d 1206, 1219 (10th Cir. 2011) (citations omitted).

Reasonable suspicion is not required, however, to justify use of a well-trained drug-sniffing dog during an otherwise legitimate traffic stop. *Illinois v. Caballes,* 543 U.S. 405, 407-09 (2005). In *Caballes,* the defendant was lawfully stopped by a highway trooper for speeding. When the trooper called dispatch to report the stop, another officer overheard the transmission

and promptly went to the scene with a drug-sniffing dog. *Id.* at 406. While the trooper wrote out a traffic citation, the officer with the drug-sniffing dog walked the dog around the defendant's car. The dog alerted on the car's trunk, it was searched, and drugs were found. *Id.* The *Caballes* Court concluded that the dog sniff, performed on the exterior of the defendant's vehicle "while he was lawfully seized for a traffic violation" did not "rise to the level of a constitutionally cognizable infringement." *Id.* at 409. The Court emphasized that in reaching this conclusion, it had accepted the Illinois Supreme Court's determination that "the duration of the stop in this case was entirely justified by the traffic offense and the ordinary inquiries incident to such a stop." *Id.* at 408. Further, the Court cautioned that a constitutional violation could have occurred "if the dog sniff had been conducted while respondent was being unlawfully detained." *Id.* at 408.

In light of these principles, the court considers the traffic stop at issue here.

## II.     The Initial Traffic Stop

The court first analyzes whether Officer Nguyen's initial stop of Lovelady's truck was justified at its inception. Ochoa does not dispute the lawfulness of the initial stop; Lovelady does. Lovelady argues that Ochoa had violated no traffic laws before the stop and that the stop could not be based on any "observed traffic violation" or "reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Botero-Ospina,* 71 F.3d 783, 787 (10th Cir. 1994) (en banc). The court disagrees.

Officer Nguyen testified that he initiated the stop for two reasons: 1) his concern that the truck tailgated the car in front of it for several seconds; and 2) his check of the truck's license

plate revealed no insurance on file. The court concludes that each of these reasons independently provided Officer Nguyen with a sufficient basis to stop the truck under Utah law.

First, Officer Nguyen reasonably believed he had observed a traffic violation when the truck changed lanes into the far right lane and very closely followed the car in front of it for several seconds—allowing only a half car length between the vehicles. Utah law prohibits a driver from operating a vehicle "more closely than is reasonable and prudent" to another car, and following at a distance which does not allow "at least two seconds [to] elapse before reaching the location of the vehicle directly in front of the operator's vehicle…." UTAH CODE ANN. § 41-6a-711(a), (b).

Lovelady argues that Mr. Ochoa's tailgating cannot provide a basis for a stop because Officer Nguyen's testimony suggests he was unfamiliar with the part of the statute concerning the seconds which must be allowed to elapse before reaching the location of the first position vehicle. *Id.* § 41-6a-711(b). Officer Nguyen's inability to recall from memory this specific part of the statute does not undermine his otherwise reasonable belief, based on his own observation, that the truck violated Utah law by following the car in front of it more closely than was reasonable under the circumstances.[9]

Second, Officer Nguyen initiated the traffic stop for the additional reason that his check of the truck's license plate revealed no insurance on file. Utah law prohibits automobile owners

---

[9] Lovelady also provides various explanations for the truck's tailgating, including that Ochoa may have changed lanes after seeing Officer Nguyen's police car approaching, and that it is common initially to tailgate another car when changing lanes. But these excuses for why the truck was tailgating do not to absolve the traffic violation that Officer Nguyen observed.

from operating or allowing their cars to be operated on the roads without insurance. UTAH CODE ANN. § 41-12a-302(1). The Tenth Circuit has held that a "not found" response to an insurance database check provides an officer with reasonable suspicion "to pluck this needle from a haystack of cars on the road for investigation of a possible insurance violation." *Cortez-Galaviz*, 495 F.3d at 1206. Although the question of insurance was never fully resolved, as discussed below, the court concludes that the report showing a lack of insurance on file justified Officer Nguyen's initial stop.

### III. The Continued Detention and Drug Sniff

Defendants argue that even if the stop was initially lawful, Officer Nguyen unreasonably expanded: 1) its scope to investigate the additional identification card Lovelady had and the possible lack of insurance on the truck; and 2) its duration to allow Officer Schiedel and Livo to conduct a drug sniff of the truck. Defendants contend that Officer Nguyen's investigation into the reasons for the traffic stop should have concluded when he received the returns on Ochoa's license and Lovelady's identification card, and that at that time he was required to issue either a citation or warning and send Defendants on their way. On the record before it, the court cannot agree.

The law allowed Officer Nguyen to detain Ochoa and Lovelady not only to investigate and resolve the reasons for the initial stop, but also to investigate for a reasonably necessary duration other criminal activity which he reasonably suspected was afoot. The court concludes that Officer Nguyen had resolved neither the lack of insurance that initially justified the stop nor the concerns of criminal activity stemming from Lovelady's possession of two identification

cards before Officer Schiedel's drug-sniffing dog had completed a sniff of the truck and alerted to the presence of drugs. Likewise, the court cannot conclude when viewing the totality of the circumstances that Officer Nguyen failed to act promptly and with reasonable diligence in conducting his investigation of these issues.

### A. The Scope of Officer Nguyen's Investigation

The court first considers the scope of Officer Nguyen's investigation during the stop. When the drug sniff began, Officer Nguyen was still investigating two issues that raised a reasonable suspicion of criminal activity: a report indicating a possible lack of insurance for the truck and his concerns of possible identity theft stemming from Lovelady's possession of two different identification cards. Neither of these issues was resolved at the time Officer Schiedel and his dog Livo conducted the sniff of the truck.

Officer Nguyen initiated the stop in part because he had obtained from dispatch an initial report showing a lack of insurance information for the truck. When he first spoke to the truck's occupants, he directly asked the driver, Ochoa, for insurance information along with his license and registration. Ochoa responded by simply providing his license—he failed to respond one way or another concerning insurance. He refused to make eye contact or speak to Officer Nguyen at all. At that point, Lovelady began speaking to Officer Nguyen. Lovelady insisted the truck was insured, but was unable to produce proof of insurance. The conversation eventually turned to another topic—the multiple identification cards Lovelady carried. Officer Nguyen testified that when he returned to his car to conduct records checks on the driver's license and identification card he obtained, he planned to further investigate the possible lack of insurance.

Defendants argue that at that point, there was nothing further for Officer Nguyen to investigate, because neither Ochoa nor Lovelady were able to produce proof of insurance. The court disagrees. Although the facts here make the issue a close one, the court cannot conclude that Officer Nguyen's stated intent to further investigate the lack of insurance issue was unreasonable.

First, although the initial records check was unavailing, Lovelady insisted that the truck was insured. It was reasonable for Officer Nguyen to further investigate that issue out of fairness to Lovelady, and to determine whether that he would need to impound the truck. As Defendants emphasized at the evidentiary hearing, Officer Nguyen had not yet received information concerning whether Ochoa might have had his own insurance that could have covered him as he drove Lovelady's car:

> Q. But you never asked Mr. Ochoa if he carried driver insurance that would cover the vehicle, did you?
>
> A. When I made my initial contact with Mr. Ochoa, I asked for his license, registration and proof of insurance, at which time he handed me just his driver's license. And that's when Mr. Lovelady advised me that the vehicle was his, and he provided me with his registration.
>
> Q. So everyone there immediately thought to look in the glove box for insurance information, but there wasn't insurance information in the glove box, was there?
>
> A. No.
>
> Q. But if Mr.—if Mr. Ochoa had carried his own insurance policy, then he would have been good to drive that car; right?
>
> A. Yes.
>
> Q. And you didn't specifically inquire about that possibility, did you?
>
> A. No.

(Tr. 68-69) (counsel for Mr. Ochoa cross-examining Officer Nguyen.)

Second, even if the court concluded that continued investigation of the insurance issue was unreasonable, Officer Nguyen clearly had a reasonable articulable suspicion of additional criminal activity—possible identity theft—supporting further investigation concerning Steven Lovelady's identification card. Officer Nguyen testified that when he saw the two similar identification cards in Lovelady's wallet, he became concerned about issues of identity theft and whether Lovelady was who he claimed to be. Common sense and experience suggest that, while not necessarily illegal, it is at least unusual for one person to carry two different identification cards. Identity theft is a significant law enforcement issue. The court concludes that Officer Nguyen had a reasonable articulable suspicion of criminal activity that justified further investigation.

Despite these legitimate investigative activities, Defendants fault Officer Nguyen for accepting at the outset Lovelady's unsolicited offer to provide his own identification, which led to Officer Nguyen noticing two identification cards when Lovelady opened his wallet. Although it was not Officer Nguyen's normal practice on traffic stops to require passengers to provide identification, in this case, Lovelady volunteered to provide his identification while Officer Nguyen was in the midst of investigating the reasons for his valid stop. Defendant's suggestion that Officer Nguyen was required to refuse Lovelady's offer is neither compelling nor supported by any authority provided by Defendants.

Defendants also argue that before Officer Nguyen returned to his car with the license and two identification cards in hand, he could not have been reasonably suspicious that any crime was afoot because he should have accepted Lovelady's explanation that the extra identification

card belonged to his incarcerated brother. Defendants contend that this explanation, particularly in light of Officer Nguyen's admitted understanding that it was not a crime in and of itself for Lovelady to have his brother's identification card in his wallet, should have dispelled any concerns he had of criminal activity. Here, Defendant Ochoa relies upon a line of Tenth Circuit cases where the police have stopped automobiles for possible license plate or vehicle registration issues, only to discover upon approaching and visually inspecting the vehicles that there was no violation, which requires and sending the drivers on their way without further investigation. These well-reasoned cases are unhelpful here. In contrast to the case before the court, those cases involved situations where the initial suspicions for the stops were wholly dispelled before any further suspicions reasonably arose.

For instance, Ochoa refers the court to the *Trestyn* case, 646 F.3d 732 (10th Cir. 2011). There, an officer in Wyoming noticed a minivan with a rear California license plate, but no front plate. The officer knew that California law required a front plate. Wyoming law required the van to either comply with California law *or* display registration numbers. The officer stopped the van. *Id.* at 736. Upon approaching the van, the officer should reasonably have been able to see the registration on the van's license plate, which would have been in compliance with Wyoming law and dispelled the entire reason for the stop. *Id.* at 743. Notwithstanding this, the officer approached the two occupants, informed them of the license plate violation, requested documents, investigated the recent purchase of the van, sought proof of insurance, and then requested a dog to perform a drug sniff of the van. *Id.* at 736. The officer then ran records checks of the licenses on both occupants as well as the car's vehicle identification number. *Id.* at

736-37. The officer with the drug-sniffing dog arrived, performed the sniff, and alerted to drugs. A search of the van yielded a cache of MDMA, also known as ecstasy. *Id.* at 737. The Tenth Circuit concluded that the evidence stemming from the drug sniff and subsequent search of the van had to be suppressed because the sole reason for the stop "would have dissipated" when the officer approached the van and saw that the license plate with its registration complied with Wyoming law. *Id.* at 744.[10]

But here, the two identification cards in Lovelady's possession gave Officer Nguyen an objective basis for his reasonable suspicion of criminal identity theft, and it was not improper for him to investigate further to dispel that suspicion. Unlike a visual inspection of a clearly compliant registration tag, the court cannot conclude that Officer Nguyen was required to accept as true Lovelady's explanation for the unusual circumstances. Officer Nguyen was entitled to conduct additional investigation to verify that Steven Lovelady was an actual person, and that Wayne Lovelady was who he said he was. Neither was Officer Nguyen required to "rule out the possibility of innocent conduct" where "the totality of circumstances suffices to form a particularized and objective basis" for the detention. *Cortez-Galaviz,* 495 F.3d at 1206 (citations omitted).

---

[10] The Tenth Circuit reached similar conclusions in other cases Ochoa cites. *See United States v. Edgerton,* 438 F.3d 1043 (10th Cir. 2006) (officer's suspicion about whether vehicle driving at night displayed required temporary tag should have been dispelled upon visual inspection); and *United States v. McSwain*, 29 F.3d 558 (10th Cir. 1994) (suspicion for stop based on lack of license plates and a difficult-to-read temporary registration sticker should have been wholly dispelled upon visual inspection of the legally compliant sticker; officer's subsequent questioning, request for documents, and consent search of the vehicle were improper).

Finally, Defendants contend that Officer Nguyen accepted and investigated the additional identification card out of sheer curiosity—akin to an impermissible hunch. The entirety of Officer Nguyen's testimony on this issue and common sense do not support Defendants' arguments. Officer Nguyen testified that he was concerned about identity theft. He also agreed on cross-examination that he took Steven Lovelady's identification card because he was curious about it. Under the totality of the circumstances, the court concludes that it is not inconsistent for Officer Nguyen to agree that he was curious about the license and that he also had a reasonable articulable suspicion that an identity theft crime might be afoot.

## B. The Duration of the Stop

Defendants argue that Officer Nguyen also impermissibly expanded the duration of the stop to give Officer Schiedel time to arrive and conduct a canine drug sniff of Lovelady's truck. In evaluating whether the stop lasted too long to be justified as an investigative stop, the court may examine whether Officer Nguyen "diligently pursued a means of investigation that was likely to confirm or dispel [his] suspicions quickly, during which time it was necessary to detain [the Defendants]." *United States v. Sharpe*, 470 U.S. 675, 686, 688 (1985) (citations omitted) (rejecting argument that a 20-minute stop was unreasonable when police acted diligently and the "suspect's actions contribute[d] to the added delay about which he complains."). The court must "take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing." *Id.* (citations omitted). Although the court has before it substantial evidence concerning the timing of the stop's events, the Tenth Circuit has emphasized that the court "need not make a time and motion study of

traffic stops; [it should] consider the detention as a whole and the touchstone of [its] inquiry is reasonableness." *United States v. Patterson*, 472 F.3d 767, 776 (10th Cir. 2006), *vacated on other grounds*, 555 U.S. 1131 (2009), *remanded to* 561 F.3d 1170 (10th Cir. 2009).

In light of these principles and the evolving circumstances of this stop, the court cannot conclude that Officer Nguyen unreasonably delayed his investigation. Fewer than ten minutes elapsed from the time Officer Nguyen first contacted dispatch to perform a records check of Ochoa's license and Lovelady's identification card (just after he called for Officer Schiedel) to the time he received the return on Steven Lovelady's identification card. By that time, the drug sniff of the truck was complete. In those ten minutes, Officer Nguyen reasonably moved forward with the investigation of the initial stop and the issues concerning insurance and the third identification card, responding briefly in the interim to the arrival of Officer Schiedel and Livo.

This conclusion comports with guidance from the Tenth Circuit. In *United States v. Patterson*, an officer pulled a car over for speeding at 10:00 a.m. 472 F.3d at 772. The officer approached the car and had the defendant driver accompany him to the police vehicle. *Id.* The officer informed the defendant that he intended to issue a warning citation, but the defendant began to converse with the officer about a wide range of topics. *Id.* The officer then asked for the defendant's registration, but it was in the car. *Id.* So, about ten minutes into the initial stop, the officer returned to the defendant's car and asked an occupant inside to give him the registration. *Id.* The officer also took that opportunity to ask the occupant about his travel plans. *Id.* at 772-73.

Only then did the officer call dispatch to perform a records check on the defendant. *Id.* at 773. As he waited for the return, another officer with a drug-sniffing dog arrived at 10:14 a.m. The two officers chatted. *Id.* At 10:15, dispatch contacted the officer who had initiated the stop with the returns. *Id.* Both officers got into the police car with the defendant. *Id.* The first officer learned from dispatch that the defendant had a history of drug crimes but his license was clear and the car he drove was registered in his name. *Id.* That officer began writing a warning citation. The officer with the drug-sniffing dog initiated a sniff of the defendant's car. At 10:17, at the same time the first officer finished writing the warning citation, the dog alerted to drugs. *Id.* The officers searched the van and found cocaine. *Id.*

The defendant moved to suppress the drug evidence, arguing that the initiating officer had continued the thirteen and a half minute stop for longer than was necessary to perform a records check and prepare a warning citation. *Id.* at 775. The Tenth Circuit concluded that the officer had acted diligently and had not unnecessarily prolonged the stop. *Id.* The court noted that the stop was of relatively short duration, and that the officer's activities—speaking to the occupants, engaging in conversations with the defendant in which the defendant did most of the talking, obtaining and checking records, waiting for returns, explaining things to the defendant, and filling out a citation—were "clearly" reasonable within the scope of the stop. *Id.* at 777 (citation omitted).

Likewise, in *United States v. Pina,* the Tenth Circuit considered whether an initial stop for failure to signal a lane change had been unreasonably prolonged to allow for the officer to conduct a sniff of the car with a dog who had accompanied him on the stop. 386 Fed.Appx. 792

(10th Cir. 2010).  There, after the officer stopped the car, he obtained the defendant driver's license, and took the defendant into his patrol car to issue a warning ticket.  As he wrote the ticket, the officer began asking the defendant questions.  For four or five minutes, the two spoke about the traffic violation, ownership of the vehicle, and the defendant's travel plans.  *Id.* at 796. The officer thought the travel plans did not make sense.  He had not, at that time, conducted a records check of the defendant's license.  The officer returned to the defendant's car to get the registration.  As he did, he asked another occupant about their travel plans and received a story inconsistent with the defendant's.  *Id.* at 794.  Only then did the officer conduct a records check of the defendant's license and registration. As he awaited the return, the officer took his dog out of his police car to conduct a sniff, instructing the car's occupant to roll up the windows and turn off the engine.  *Id.*  Twelve minutes had elapsed since the initial stop.  *Id.*  The dog alerted to the presence of drugs, and upon a search of the car, police found cocaine.  *Id.*  Relying on *Patterson,* the Tenth Circuit found "no indication of unreasonable delay" by the officer.  *Id.* at 796.

Defendants here nevertheless argue that Officer Nguyen unreasonably delayed the investigation when he: 1) called to request that Officer Schiedel come to the scene before he began conducting records checks of Ochoa's license and Lovelady's identification card; 2) awaited the returns on Ochoa's license and Lovelady's identification card without beginning to write out a citation; and 3) chose not to check Steven Lovelady's identification card at the same time he called to check Ochoa's license and Wayne Lovelady's identification card.  Particularly in light of *Patterson* and *Pina,* the court disagrees.

First, Officer Nguyen's request for a drug-sniffing dog before he called to conduct a

records check on Ochoa's license and Lovelady's identification card may have added seconds at most to the duration of the stop and allowed the drug sniff to occur moments earlier than it might otherwise have. The court cannot conclude that Officer Nguyen's decision to make one brief call prior to another amounts to a constitutionally impermissible delay.

Next, Defendants contend that while awaiting the return on Ochoa's license and Lovelady's identification card, Officer Nguyen should have been preparing a citation, as was sometimes his practice. But at that time, Officer Nguyen was uncertain who Lovelady really was. He also had information from Lovelady concerning insurance conflicting with the report he had received from dispatch, and had not yet determined how to resolve that issue. Officer Nguyen testified that given those questions, he was not prepared to issue a citation at the time he had taken the license and identification cards to his car to perform a records check. (Tr. 41, 64-65.) He explained that he was "going to conduct a records check and investigate if they did have valid insurance, and if their driving status was good," and to "validate the information [he had]." *Id.*

Defendants also fault Officer Nguyen for briefly helping to facilitate the drug sniff when Officer Schiedel arrived. In particular, Lovelady argues that Officer Nguyen took the time to order Ochoa and Lovelady out of the truck before Officer Schiedel and Livo arrived. Officer Schiedel testified that Ochoa and Lovelady were out of the truck when he arrived. But Officer Schiedel's memory is contradicted by the video he began recording moments after he arrived on the scene, which shows Ochoa walking outside and Lovelady just getting out of the truck. (Def.'s Exh. 1003.) Further, the court finds that it was not unreasonable for Officer Nguyen, the

officer who initiated the stop, to take a few moments to orient and briefly assist Officer Schiedel, who had just arrived. Once Officer Schiedel went to retrieve Livo, Officer Nguyen promptly returned to his own investigation of Steven Lovelady's identification card.

Finally, Defendants argue that Officer Nguyen should have called in the records check on Ochoa's driver's license and the two Lovelady identification cards at one time, rather than first calling in the license and identification card of the truck's occupants and waiting to call in the extra identification card for Steven Lovelady a few minutes later. But Officer Nguyen explained that he called in Ochoa's license and Wayne Lovelady's identification card first because Lovelady told him that he was the car's owner. Officer Nguyen had prioritized first "try[ing] to identify who the registered owner is and who Mr. Wayne Lovelady is." (Tr. 17.) Officer Nguyen's desire to rapidly ascertain information about Lovelady is reasonable.

A year-and-a-half after the stop and with the benefit of hindsight, it is possible to imagine ways in which Officer Nguyen might have managed the traffic stop differently, perhaps even more efficiently. It might be that had he called in all three identifications at once, and if dispatch was able to process them all promptly, the stop might possibly have concluded a moment earlier.

But the law does not require that an officer's conduct be perfect, or perfectly efficient, during a traffic stop. Traffic stops are inherently fluid and unpredictable situations. The law requires only that an officer not unreasonably extend the stop's scope or duration. Trial courts are instructed not to second-guess an officer's otherwise reasonable conduct managing a stop. Officer Nguyen's conduct here was reasonable and justified in light of the issues he was investigating and his sworn testimony, which the court accepts.

Accordingly, the court concludes that Officer Nguyen's initial stop of Lovelady's truck was lawfully based on Officer Nguyen's observation of the truck's tailgating and the report that no insurance could be found on file. Further, Officer Nguyen had reasonable suspicions of criminal activity to justify investigating the truck's possible lack of insurance and the two identification cards Lovelady had. The court concludes that he reasonably and diligently investigated those issues during the stop, and before Livo concluded the sniff of the truck.

### C. The Search of the Truck and its Contents

Because Livo alerted to the odor of drugs in the course of an otherwise lawful stop, Officers Schiedel and Nguyen had probable cause to search the car and its contents. *United States v. Engles*, 481 F.3d 1243, 1245 (10th Cir. 2007) (citations omitted).

### CONCLUSION

For the reasons set forth above, the court concludes that Officer Nguyen was justified in initially stopping Lovelady's truck for tailgating and a lack of insurance on file. Officer Nguyen's reasonable suspicion about the unlawful lack of insurance was not dispelled after he spoke to the Defendants, and a reasonable suspicion of criminal identity theft arose when he viewed the two different identification cards Lovelady had in his wallet. Officer Nguyen did not impermissibly expand the scope of the investigative stop to continue to pursue these issues, and his actions did not unreasonably extend its duration. Thus, Livo's drug sniff took place during an otherwise lawful traffic stop. Livo's alert to drug odor during that sniff provided the police with probable cause to search the truck. The evidence derived from that search is not subject to suppression on the grounds set forth in Defendants' Motions to Suppress.

Accordingly, Defendants' Motions (Dkts. 43 and 48) are DENIED.

DATED this ___28th___ day of <u>May</u>, 2014.

BY THE COURT

Honorable Robert J. Shelby
United States District Court